## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**JOHN SCOTT CASTO, II,**
    **Plaintiff,**

**v.**
                                        **Civil Action No.: 3:16-cv-05848**
                                        **Chief Judge Robert C. Chambers**

**BRANCH BANKING AND**
**TRUST COMPANY,**
    **Defendant.**

## PLAINTIFF'S SURREPLY IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO VACATE SCHEDULING ORDER

### *Introduction*

Comes now the Plaintiff, John Casto, and files this surreply in opposition to Defendant's motion for summary judgement, and moves to vacate the scheduling order to allow the Plaintiff time to conduct discovery in follow up to the depositions of Defendants' agents Dianna Stamper and Amy McLaren. The Defendant, BB&T relies completely on the expertise of an agent CT Corporation System (CT) and their unsupervised subcontractor AllCorp to process their attorney representation notices under the West Virginia Consumer Credit and Protection Act. BB&T provides no training or documentation to CT as to how notices of attorney representation in West Virginia are to be handled. Instead, they leave CT and Allcorp to their own devices. On July 27, 2017, this Court ordered BB&T to produce a witness to testify to the processing and handling of Plaintiff's notice of attorney representation. The Defendant refused to produce a witness from BB&T and instead threw their agent for service of process, CT and Allcorp under the bus.

Allcorp and CT then began to make so many contradictory representations that is difficult to impossible, without additional discovery and perhaps even adding CT on as a Defendant, to truly understand the full scope of the unsupervised and unaccountable mail handling shenanigans

1

that took place in this case.  At the very least,  the case needs to be presented to a jury to sort out what exactly the truth is, because it is not clear from the record at all.

### What Happened to Plaintiff's Letter?

To sort out what happened to Plaintiff's letter, we must first have some context to understand how little CT and Allcorp actually know.  First, Plaintiff's letter was mailed to BB&T care of CT Corporation Systems in Charleston, WV.  The letter was postmarked with a cancellation stamp by the United States Postal Service at the Charleston post office on December 21, 2015.[1]  That means the letter was in possession of the Charleston, West Virginia branch of the United States Postal Service ready to be processed to CT as of December 21, 2015.  The Defendant's agents, CT and Allcorp, would then have us believe that it then took sixteen days for that letter to get to CT's office on the other side of Charleston, at 5400-D Big Tyler Road. During that same timeframe, the post office delivered more than 250 other letters to 5400-D Big Tyler Rd., Charleston, WV.[2]  Clearly the post office was not having a problem finding CT's office on Big Tyler Road.

Not only that, but during that same timeframe, another letter sent by the Plaintiff to CT in Charleston and also postmarked on December 21, 2015, according to Defendant's agent CT, took 15 days to get from the post office in Charleston to 5400-D Big Tyler Rd., Charleston, WV.[3]  So, not only is the postal system supposedly so incompetent that they lost one letter for sixteen days after they postmarked it, but they contemporaneously lost a second one for fifteen days after they postmarked it on December 21, 2015 as well.  It strains belief, and there is a much more likely

---

[1] See Exhibit 1, Deposition Transcript of Dianna Stamper taken 8/29/2017, p. 67:13-17.
[2] See Exhibit 2, Count of letters for 5400-D Big Tyler Rd., Charleston, WV 25313 address between 12/21/2015-1/6/2016.
[3] See Exhibit 5, letter from Plaintiff to Central Mortgage Company, postmarked 12/21/2015, processed by CT supposedly on 1/5/2016.

conclusion. But, to reach it, we must understand how CT fails to do any meaningful supervision of its local subcontractor, Allcorp, in West Virginia.

The structure of the various companies involved in this case is unique. It is unlikely that many corporations would choose to structure the handling of their most important mail this way. CT Corporation System does not process the mail addressed to CT Corporation System, 5400 D Big Tyler Rd., Charleston, WV 25313. A sub-subcontractor of CT called "Allcorp" does that. Allcorp is a small entity owned by Dianna Stamper and her husband. They are the sole employees. CT does not physically supervise the work done at 5400-D Big Tyler Road, Charleston, WV 25313, and, since Dianna Stamper started operating there in 2010, CT has only sent supervisory staff out to her office twice. Once to train Stamper when she first started in 2010,[4] and then once again within the last year for something that nobody seems to know or remember the reason for.[5] However, something significant happened on the second visit that made Ms. Stamper remember the exact time the mail ran that day and what time they finished the mail.[6] It is an interesting coincidence that this mysterious visit coincides with CT's Charleston location losing enormous amounts of first-class attorney representation letters. No supervisory staff was sent to Ms. Stamper's office in the five years prior to the facts that give rise to this case, except to train Ms. Stamper in 2010.[7]

---

[4] See Exhibit 1, Stamper Depo. p. 35:19-36:16.

[5] *Id* at 36:17-37:17 ("**Q. What triggered that visit from CT, do you know?** A. I don't know. **Q. What did they do when they came?** A. He visited, observed my mail processing procedures. Talked about business things. Had lunch. And he left."); also see Exhibit 6 CT Corporation System's corporate representative Amy McLaren's deposition, Aug. 31, 2017, p. 24:14-25:8 ("**Q. But you do know that somebody did go out there last year some time?** A. Yes **Q. What was that all about?** A. I don't know. **Q. Was there any report generated from the visit?** A. No. Not that I know of.").

[6] Ex. 1, Stamper Depo. p. 38:2-10.

[7] *Id* at p. 35:19-36:24.

3

Allcorp does not stamp mail as "received" when it comes in.[8]  Further, CT has no documentary proof that the two letters Plaintiff sent to CT Corporation System and postmarked on December 21, 2015 were processed on the same day they were received by Allcorp:

> **"Q.  What documentary proof does CT have that Ms. Stamper**
>
> **scanned these two letters on the same day that she received them?...**
>
> A.  I don't know of any documentary proof..."

Ex. 6, Amy McLaren Depo. p. 82:7-14 (objections omitted).

> **"Q.  So, if for some reason a particular employee either negligently or**
>
> **for whatever reason forgot about it [a letter] or whatever, that they didn't**
>
> **scan a letter on a particular day and later scanned it and put it in the system,**
>
> **what proof would you have that that didn't or did occur?**
>
> A. Well, we wouldn't have physical proof necessarily that that didn't
>
> occur..."

*Id* at 82:24-83:8.  Ms. McLaren then testifies at length about CT's supposed "process" for ensuring that first-class letters are processed correctly back in 2015-16 by having a count on a "first-class mail spreadsheet."

> "A. ...For traceable mail we have traceable mail manifests form the post
>
> office.  And then for regular mail captured on the spreadsheet and we verify that
>
> all of the pieces have been scanned and have been processed.
>
> **Q.  How long have you been doing that?**
>
> A. As long as I've been at CT.

---

[8] *Id* at 39:2-8.

**Q. And that includes the spreadsheet count of the number of first-class letters that have been going on as long as you've been at CT?**

A. Yes.

**Q. Has Ms. Stamper been doing that –**

A. Yes."

*Id* at 41:19-42:10.  Ms. McLaren has worked for CT for eleven years.[9]  Ms. McLaren goes on:

**Q. Do you recall the if you did one around 2015?**

A. I can't remember.

**Q. Do you remember the first time you did one of those?**

Mr. WEXLER:  Sorry.  It's vague. Did one of what?

**Q. One of those trainings on how to use the first-class mail spreadsheet?**

A. Most  -- I don't remember the exact date.

**Q. Was it within the last year?**

A.  We had training calls with the representative offices probably between 2010 and 2014.  And then we just had another one within the last month or two.

**Q. Between '14 and '17 you don't think there any though?**

A. No, I'm sure there were but I wasn't in direct communication for those training calls."

*Id* at 54:8-55:4.

**"Q. And is that spreadsheet for the first-class letter, is that included anywhere in Exhibit 5?**

---

[9] Amy McLaren depo. at 4:11-13.

A. No.

**Q. Did you look at that spreadsheet prior to your deposition today?**

A. No.

**Q. But you're sure that there is one that exists out there somewhere?**

A. There should be…"

*Id* at 63:19-64:4.

The problem is that, this 2015-16 first-class mail spreadsheet, which is how CT's local representative offices like Allcorp are supposed to reconcile their first-class letters that come in everyday, **does not exist and never did**. When Plaintiff requests a copy of the first-class mail reconciliation spreadsheets from December 2015 and January of 2016, Plaintiff's received this response from CT's counsel:

> "With regard to the second question, there was no U.S. Mail spreadsheet created for the time period at issue here. I think your confusion may have come about because of the new workflow introduced more recently."[10]

If Plaintiff is confused, it is only to the extent that the Ms. McLaren has wasted her attorney's time testifying to a particular system having been in place "As long as I've been at CT" or "eleven years," but was, in fact, only put in place very recently.[11]  Again, let me point out, Ms. McLaren clearly testified:

> "A. …For traceable mail we have traceable mail manifests form the post office.
>
> And then for regular mail captured on the spreadsheet and we verify that all of the
>
> pieces have been scanned and have been processed.

---

[10] See Exhibit 3, Email from Colin Wexler to Benjamin Sheridan, dated 9/15/2017 about the first-class mail spreadsheets and emails between Ms. Stamper and Ms. McLaren.  Attachment are both included under seal as Exhibit 4.

[11] Ex. 6, McLaren depo at 41:19-42:10.

**Q. How long have you been doing that?**

A. As long as I've been at CT.

**Q. And that includes the spreadsheet count of the number of first-class letters that have been going on as long as you've been at CT?**

A. Yes.

**Q. Has Ms. Stamper been doing that –**

A. Yes."

*Id* at 41:19-42:10. This does jive with Mr. Wexler's email form a few days ago.[12] Upon information and belief, the first-class mail spreadsheet was implemented within the last three months and was implemented by Ms. McLaren.  See Exhibit 4, Emails between Diana Stamper and Amy McLaren from July 5, 2017 about the new procedures including how the "Regular Mail Spreadsheet" will be handled.  Either Ms. McLaren was confused or just going on about something verifiably false and assuming Plaintiff would never ask for the spreadsheets. Defendant BB&T did refuse to produce a witness until after the close of discovery and managed to put Plaintiff in this pinch.   Plaintiff had to subpoena the emails and spreadsheet after Ms. McLaren's deposition to get any response.  No matter what, it is hard to find the truth in this environment.

There are additional records and information Plaintiff needs, including why Ms. Stamper was visited by CT Corporation all of a sudden about the same time her office became the hot spot for losing first-class notices of attorney representation in West Virginia.  Neither Ms. Stamper nor Ms. McLaren seemed to know, but it seems likely Rich McEver, Ms. Stamper's supervisor at CT would know something.[13]

---

[12] Ex. 3, Colin Wexler Email.
[13] Ex. 6, Amy McLaren depo at 29:13-16.

7

Ms. Stamper, who was clearly shaken up about something and defensive throughout her deposition, testified that, aside from the mail she throws away,[14] she scans the rest the same day she receives it.  However, everything Ms. Stamper testified to has to be taken with a grain of salt. Her attorney literally had to stop the deposition to correct her story at one point.

> **Q. Have you ever spoken with anybody from BB&T about this case?**
>
> A. No.
>
> **Q. Have you ever spoken with any attorneys from BB&T about this case?**
>
> A. My own.
>
> **Q. He doesn't represent BB&T.  So anybody else other than –**
>
> A. Oh, no.  No.  I haven't spoken to anybody.
>
> MR. WEXLER:  Can we take a break for just a second?
>
> MR. SHERIDAN: Of course.
>
> (Break in the proceedings.)
>
> BY MR. SHERIDAN:
>
> **Q. So my understanding is that you wanted to correct an answer?**
>
> A. Yeah.  I would like to apologize.  When you asked me if had spoke to any other attorneys about this case, I had forgot about the phone call I had last night with BB&T's attorney."

Ex. 1, Diana Stamper depo at 30:18-31:13.  As we can see, these depositions began developing a perplexing relationship with the truth.  Plaintiff would love to have additional time in discovery to understand what the truth is, but he was denied a deposition by BB&T until the Court

---

[14] Ex. 1, Diana Stamper depo at 29:6-29:24.

graciously granted Plaintiff's motion to compel.  Unfortunately, that was after the discovery

cutoff, and for that reason, Plaintiff moves for additional time to explore these themes and

eliminate as many outstanding questions of facts as can be easily resolved.

> ***What we know, and what we need a jury or additional discovery to sort out.***

We all know what happens when employees are not supervised.

> **"Q. In the last 20 months how many days has CT had someone in the**
>
> **West Virginia office supervising the work of Ms. Stamper?**
>
> A. Are you asking how many days we physically had someone in the
>
> office supervising the work of Ms. Stamper?
>
> **Q. Right. Yes.**
>
> A. We have not…"

Ex. 6, Amy McLaren depo. p. 84:13-20.  Ms. Stamper has had someone from CT watching her

work only once in seven years since she was trained.

> **"Q. Do they [CT] ever come by the office on Big Tyler Road?**
>
> A.  They have.
>
> **Q. How often do they do that?**
>
> A.  Two times.
>
> **Q.  Total?**
>
> A. Yes…
>
> **Q. One was in the year.  The other was prior to the last year?**
>
> A. Yes.
>
> **Q. How long ago was it, do you recall?**
>
> A. We had a lady come in to train us.

**Q. When was that.**

A. 2010.

**Q. When was the most recent audit where CT came by?**

A. I can't really exactly remember because of the way time flies.  And I

don't – I want to say it was like June, last year.

**Q.  June of '16, do you think?**

A. I think."

Ex. 1, Stamper depo. p. 35:14-36:24. Ms. Stamper had one visit for her initial training in 2010,

and then once again for a few hours about a year ago.  Not much seems to have come of that

second visit.  There were zero visits by CT in between those two visits over approximately six

years.  So, the question we are left with is:

Is it more likely that the United States Postal Service took 15 and 16 days to deliver two

separate letters, that it had already postmarked, across town to an address that the post office

regularly delivers to, in bulk, or, is it more likely that those letters were delivered timely by the

United States Postal Service but not processed timely by an employee who had not been visited

by her boss in about five years?  If there is even a moment's hesitation on the question, then it is

probably a question for a jury.

*a. Training*

First, it might make sense to look at what kind of training Ms. Stamper received from CT

and BB&T on attorney representation letters, given the significant liability that BB&T and CT

may be exposed to for failing to process those letters quickly and correctly.  It is undisputed that

BB&T itself provided no instruction or training to CT or Allcorp at any time in this case.[15]

---

[15] Exhibit 6 Amy McLaren depo. p. 96:10-13.

BB&T refused to produce a corporate representative to testify as to what information they provided to CT or Allcorp despite Plaintiff requesting a witness, therefore, they should be precluded from attempting to refute their agent Ms. McLaren's testimony at trial.

CT does not even bother to provide regular training to its unsupervised local staff.

> **"Q. Does CT conduct any kind of regular training for its representative offices?**
>
> A. We have training sessions on an as-needed basis with all offices....
>
> **Q. Do you have any regular training sessions, like a training session every two months or every third Wednesday or something like that?**
>
> A. No."

Ex. 6, Amy McLaren dep. p. 39:18-40:21 (objections to witness knowledge omitted). At this point, it is becoming difficult to identify when CT interacts with their employees at all. Ms. McLaren's office is the office that generated the training materials were supposedly presented to Ms. Stamper.[16] However, in this case, the typically minimal training that CT provides, hosting a webinar, was not conducted.

> **"Did you train Ms. Stamper on these letters?**
>
> A. No.
>
> **Q. Who did?**
>
> A. The management group trained her on those.
>
> **Q. Who typically does training on this kind of stuff, is it your office or a management group?**

---

[16] *Id* at 27:4-7.

A. Typically it's my group.  We would be the ones that we prepare the

documents and then cascade them out.  And depending on what the changes is or

what the need is we would host a webinar.

But with these we shared the documents and everyone was able to

understand what the documents were regarding and what the change was to the

work flow so it was not necessary for us to host a webinar."

Ex. 6, Amy McLaren depo. p. 27:8-28:4.  The individual that actually supervised Ms. Stamper

was a man by the name of Rich McEver. Plaintiff was not offered his deposition by the

Defendant and did not discover his identity, which was kept hidden form Plaintiff, until Ms.

McLaren's deposition. Instead, the witnesses Plaintiff got were presented in a take it or leave it

style by BB&T, with Amy McLaren, who did not supervise Ms. Stamper, and Ms. Stamper being

Plaintiff's only options. Ms. McLaren was likely offered because she does not do discipline and

does not really know anything about it or frankly much else relevant to this case.

**"Q. And do you have any documentation or records that show that the**

**updated examples [of attorney representation letters] were sent to Ms.**

**Stamper?...**

A.  We share the updates. I don't know how they were sent to Diana

Stamper.  I'm guessing by email but I don't know.

**Q. So you don't know if they were sent to her or not, correct?**

A. I don't know how they were sent to her but they were provided.

**Q. How do you know that?**

A. Because we discussed these documents on our manager call.  And we

discussed any updates we make and we confirm that all of the information has

been cascaded to the teams.

**Q. So you had another specific call in which the management team**

**told you they sent these updates out to the representative offices?**

A. Yes.

**Q. And when was that particular call?**

A. I don't remember the date."

Ex. 6, McLaren depo. p. 38:16-39:16.  To drive that point home Ms. McLaren testified:

**"Q. Does CT have any disciplinary process for representative offices?**

A. I don't know.  As I mentioned earlier, my team does not handle

supervision of these offices.  So that's not a task that I would be familiar with, so

I can't answer that."

Ex. 6, McLaren depo p. 25:15-22 (scope objection omitted).  Ms. McLaren testified she did not

even know whether or not there was a disciplinary process.  Though, she once again contradicted

herself when she later testified to a scenario in which discipline would be introduced and that she

was aware that discipline had been introduced before at CT.[17]

Quoting from Defendant's own brief on summary judgement, "[u]nder West Virginia

law, negligent supervision claims must rest upon a showing that the employer failed to properly

supervise its employees and, as a result, those employees proximately caused injury to another."

Biser, 2016 U.S. Dist. LEXIS 134427 at *27 (quoting Ferrell v. Santander Consumer USA, Inc.,

859 F. Supp. 2d 812, 817-18 (S.D.W. Va. 2012) (Copenhaver, J.)).  Assuming for a moment that

---

[17] Ex. 6. McLaren depo. p. 90:5-91:10.

this is 100% accurate, then it is undisputed that nobody made any attempt to supervise Ms. Stamper in the five years leading up to the events giving rise to this case,[18] except to maybe email her some instructions or provide a webinar intermittently. There was no system to monitor her work on first-class mail.

Ms. McLaren testified that a team called "Workflow Coordinators" were in charge with watching work product and making sure that folks like Ms. Stamper were actually doing their job. But, when pressed on whether or not they could discover Ms. Stamper's negligence on processing first class mail, she said no.

> **"Q. I'm sorry, I think my question was confusing. The letter arrives on Monday and it's a first-class letter and it's stuck in a bucket somewhere and nobody looks at it again until Friday when it's counted on the spreadsheet and then scanned on Friday, would the work flow coordinators be able to tell that this happened based on the reports that they look at?**
>
> A. No. But that wouldn't happen."

Ex. 6, McLaren depo. 99:20-100:5. This is a terrifying response for two reasons. First, it is an employer who does not supervise its employees stating that a particular event is impossible when there are no controls in place to stop the bad conduct. Second, its admission that there are no controls in place for CT to detect if their employees, like Ms. Stamper, are being negligent. That is a recipe for disaster, and disaster is precisely what has happened here. The Titanic sunk because nobody thought of or was willing to acknowledge the possibility of employees missing an iceberg. Every employee can make mistakes. An unsupervised employee will make mistakes. A company with a hole in its systems to detect those mistakes is asking for trouble.

---

[18] Ex. 1, Stamper Depo. p. 35:19-36:24.

The Defendant and their agent CT did not even bother to visit Ms. Stampers West Virginia office once except for initial training during the period of time relevant to this case. If that is the standard for adequate supervision in West Virginia then there is no standard. One idea, if Defendant is looking for one, is to install a video camera. Wifi cameras run wirelessly through the internet and cost about $100 or less per camera, including sound.

### b. Fear of Self-Reporting

CT places a great deal of faith in Ms. Stamper, but also makes clear that if she makes a mistake and self-reports it, she likely will be disciplined for her behavior. This policy gives employees a substantial incentive to hide mistakes. Anyone who has ever operated a business knows that if you give total autonomy to an employee, as CT has given Ms. Stamper, CT must also have a way for Ms. Stamper to self-report her mistakes and failures without significant fear of reprisal. Otherwise, the business builds an environment in which it does not supervise its employees, expects them to perform to a particular standard, but if they make a mistake they must bury it or they know they will be punished, perhaps even terminated or worse. This is very dangerous situation CT put Ms. Stamper and themselves in. Completely unsupervised, poor or absent monitoring systems for her work, and no way to self-correct. Businesses do have a choice. They can actually supervise their employees, or they cannot supervise them and suffer the consequences. However, completely unsupervised and mostly untrained employees will make mistakes at the very least simply out of confusion of how the system works. The boss may see in his or her head exactly how things are supposed to happen. But, if that vision is not translated into constantly supervised and reminded employees, there is no guarantee that what is in the mind of the employer will make it into the mind and mission of the employee. And, even if the vision is communicated effectively, it may not stick without reminders.

The reality is that a completely unsupervised office is a recipe for disaster.  If over the course of five years, an employee learned that she would not be bothered by even a surprise inspection, watch out.

When asked about discipline Ms. McLaren testified:

> **"Q.  What would you do if a representative office came to you and said, hey, I've been intentionally sitting on first-class mail for a week or two at a time, what should I do about it?**
>
> A.  Well, the first thing I would do would be to have that representative office get the work scanned in with the actual received date.  We would get the transmittals created.  We would notify our client of the delay, that it was a human error.  And we'd have to look to see if we needed to escalate this to our internal executives.  We would also have to escalate this to whoever was the manager of that group for disciplinary action."

Ex. 6, McLaren depo. p. 90:5-19.  Ms. McLaren does not know if CT has ever had a terminate a representative office.[19]  Since the otherwise unsupervised employee would clearly be treated harshly in this scenario for self-reporting bad conduct, then it is logical to conclude employees will avoid self-reporting.  This kind of policy encourages hiding mistakes.  Progressive companies, like Toyota, understand this and have policies in place that, for example, if an employee has a drug problem and they self-report to the company, Toyota will help the employee get treatment and will not terminate them. It is only if the employee hides the problem and its later discovered will they be treated harshly.  As a result of CT's policy, it would be very difficult to know what really happened here without talking to Ms. Stamper's supervisor.  But

---

[19] Ex. 6, McLaren depo. p. 91:17-19.

even then, Ms. Stamper is not going to admit directly to anything that may result in disciplinary action so long as she works for CT, and Defendant admits that the system they use to monitor her work on first-class mail, the "first-class mail spreadsheet" did not exist at the time.[20] It is a cozy job. Her boss only came by once in seven years after training.

### c. What does the Post Office say?

First class mail does not have any tracking system unless its paid for through the expense of certified mail. The difference between a certified letter and first class is about $6, which can be a significant burden in the poorest state in the union. While the legislature, in reaction to lobbying from banks such as BB&T who had poor first-class mail handling systems, began requiring certified mail in attorney notices sent after July of 2017. That change does not apply to this case. It is important to point out that having notices of attorney information mailed was a change requested of the legislature by the banks and not consumers or consumer friendly representatives. In fact, BB&T's attorney in other cases, Danielle Swann with Jackson & Kelly, is also a banking lobbyist actively involved in pushing for the change to switch to mail and later certified mail attorney representation notices and otherwise placing limits on consumer protections. Thus, it seems likely BB&T knew of the restrictions on consumers that were coming through the legislature and actively advocated for switching notices to mail. Prior to that, notices were often given on the phone and the bank's telephone recording system could verify the attorney notice was given and the call was automatically associated with the account.

The post office website says that a first-class letter will arrive in one to three business days.[21] The postal service has been at this for quite a while, and given the massive amount of

---

[20] See Ex. 3, Colin Wexler email.
[21] First-Class Mail, USPS.com, available at https://www.usps.com/ship/first-class-mail.htm (accessed 9/17/2107); also see Exhibit 7, a printout of the USPS First Class Mail previously discussed in this footnote.

mail they move nationwide every day, do an amazing job of delivering first class main in 1-3 days. Had the Plaintiffs letters arrived within three days, or even perhaps five days, Plaintiff would not have a case. However, here, the Defendant would have us believe that their mostly untrained and completely unsupervised agent for mail in West Virginia received two pieces already postmarked on December 21, 2015 fifteen and sixteen days later. Is it possible? Sure, but so is winning the lottery. Ms. McLaren testified that she does not know if its common or not.[22] The question is, is it more likely that the letters were delivered over two weeks later or is it more likely the Defendant's completely unsupervised agent did not open them immediately? The real question is which of these two scenarios, based on the evidence we have available, would a jury believe.

### *Conclusion*

It is difficult to fathom what an office would be like if the supervisor did not drop by for five or six years. It is already difficult to get some employees motivated to work in a world of smartphones and Facebook when they are watched. But, an office where there is no supervision of an important job function like processing first-class mail for major corporations for five years? Frankly, it is difficult to imagine a company caring so little about the work it does to not have surprise inspections even once in that five-year period. The postal service at least has supervisors. It has structure. It cares about its mission. CT dropped an office in West Virginia, ran the setup training for their employees' half a decade ago, and never came back until after it became clear there was a problem. CT went to such great lengths to distance themselves from having to do the job they are contracted to do, they do not even put their local contractors on the payroll. They require them to setup their own companies. Likely so they can pass the blame. CT

---

[22] Ex. 6, McLaren depo. p. 88:2-6.

takes no responsibility to supervise, no responsibility to monitor, and no responsibility for their work when it clearly falls short, as it did here.  CT claimed to have systems to monitor the Plaintiff through spreadsheets and a product called "Arrow," but then admits after the deposition that the spreadsheet did not even exist.[23] Thus, they had no way to monitor Ms. Stamper on first class mail after all.

BB&T similarly believes they have no responsibility for the work of the agent they hired to handle BB&T's most important mail, CT.  Is it Plaintiff's responsibility to supervise CT?  Is it Plaintiff's responsibility to also supervise Allcorp?  Defendant and their agents react by blaming the United States Postal Service, or the Plaintiff, Plaintiff's counsel's "confusion,"[24] or anyone other than their own system which builds in all the key recipes for failure.  Though, they are the first to impose, strictly, their rules on their customers when they ignore them.

When you mess up, you own it, learn from it, and move on.  The Plaintiff did everything right here.  The Defendant does not get to pass the burden for their own failing unsupervised systems onto their unsuspecting customers.  That is not how justice works. The Defendant has to own the work of the agents they choose, even if it's sloppy and they do not like it. If BB&T does not want to handle its mail in house as many banks choose to do.  Fine.  But they have the burden for ensuring the agents they outsource that important work to are doing an adequate job. This work is not the Plaintiff's responsibility.  Clearly here, the Defendant has some significant failings in the process.

This case has also exposed why timely discovery and depositions are so important as well.  In arbitration, for example in the AAA where discovery and depositions do not exist, the

---

[23] See Ex. 3, Email form Colin Wexler dated Sep. 15, 2017 in which Mr. Wexler explains that Plaintiff's counsel must be confused over the first class mail spreadsheet that Ms. McLaren testified existed "As long as I've been at CT;" also see, Ex. 6, McLaren depo. p. 41:19-42:10.
[24] See Ex. 3.

issues with CT's office in Charleston may never have been exposed.  Regardless of the outcome

of this case, the CT office in Charleston which handles a large percentage of the most important

mail in the state of West Virginia will likely operate a little differently going forward, and

companies that may have been missing important documents and records will be able to worry

less.  It is unlikely CT will go another five or six years without supervising their local office

again.  That, is a really good thing.

     For the foregoing reasons, Plaintiff respectfully requests that defendant's motion be

denied as there is a question of fact as to when the jury believes Plaintiff's letters arrived at CT

in Charleston.  Further, Plaintiff requests the scheduling order be vacated and discovery extended

so that Plaintiff can follow the threads that he would have followed had he been allowed to

conduct depositions in a timely fashion by the Defendant.  The Defendant should not be

rewarded for hiding their sloppy mail handling system until the end of the case.  The Plaintiff

further requests any other relief as the Court deems equitable and just.


                           **John Casto II**
                           BY COUNSEL



BY:   /s/ Benjamin M. Sheridan
        Benjamin M. Sheridan (#11296)
        *Counsel for Plaintiff*
        Klein & Sheridan, LC
        3566 Teays Valley Road
        Hurricane, WV  25526
        (304) 562-7111

## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
## DISTRICT OF WEST VIRGINIA, CHARLESTON DIVISION

**JOHN SCOTT CASTO II,**
    **Plaintiff**


**vs.**                                     **CIVIL CASE NO. 3:16-cv-5848**


**BRANCH BANKING AND**
**TRUST COMPANY**
    **Defendant.**


## CERTIFICATE OF SERVICE

I, Benjamin Sheridan, attorney for the Plaintiff, certify that I served a true copy of the foregoing **"PLAINTIFF'S SURREPLY IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO VACATE SCHEDULING ORDER"** on the Defendant as listed below on this 18th day of September 2017, *first class mail postage* prepaid.

D. Kyle Deak
TROUTMAN SANDERS
Suite 1900
434 Fayetteville Street
Raleigh, NC 27601
*Counsel for Defendant*

Massie Cooper
TROUTMAN SANDERS
1001 Haxall Point
Richmond, VA 23219
*Counsel for Defendant*

                            /S/ Benjamin Sheridan
                            Benjamin Sheridan (# 11296)
                            Klein & Sheridan, LC
                            Clyffeside Professional Building
                            3566 Teays Valley Rd
                            Hurricane, WV 25526
                            Phone: (304) 562-7111